UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| ELIZABETH ERNEST, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 25-210-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| FRANK BISIGNANO, | ) | **MEMORANDUM OPINION** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Plaintiff Elizabeth Ernest ("Ernest") appeals the Social Security Administration's denial of her claim for Disability Insurance Benefits ("DIB"). [Record No. 11] She argues that the Administrative Law Judge ("ALJ") assigned to her case failed to build a logical bridge between his conclusions and the evidence, failed to reconcile the vocational expert's testimony with her Residual Functional Capacity ("RFC"), and failed to consider non-medical evidence when evaluating subjective testimony. [*Id.*] As a result, Ernest contends the decision is not supported by substantial evidence. [*Id.*] She further argues that the ALJ erred by failing to properly apply the medical-vocational grid rules in the "borderline age" situation presented here. [*Id.*]

After reviewing the record and considering the parties' arguments, the Court concludes that substantial evidence supports the ALJ's decision and that the ALJ applied the proper legal standards.

-1-

# I.

At the alleged onset of disability, Ernest was 49 years old which is defined as a younger individual.  [Record No. 8 at 37, 89] She subsequently changed age category to closely approaching advanced age before the date last insured.  [*Id.* at 37] She has at least a high school education and has work experience as a nurse.  [*Id.* at 38, 231, 232] Ernest alleges that she became disabled beginning October 31, 2018, due to plantar fasciitis, bone spurs, neuropathy, carpal tunnel, cervical osteoarthritis, cervical canal spinal narrowing, lumbar degeneration, anxiety, depression, and fibromyalgia.  [*Id.* at 215, 230]  She filed an application for DIB under Title II of the Social Security Act ("Act") on February 9, 2022.  [*Id.* at 29, 215–218]

ALJ Jonothan Stanley held an administrative hearing on October 24, 2023, after Ernest's claims were denied initially and on reconsideration.  [*Id.* at 29, 44–71, 107–11, 121–24]  Thereafter, ALJ Stanley issued an opinion denying Ernest's claim for benefits.  [*Id.* at 26–39]  The Appeals Council denied Ernest's request for administrative review of the ALJ's decision on February 6, 2024, thereby making it the final decision of the Commissioner.  [*Id.* at 15–17] The matter is now ripe for judicial review pursuant to 42 U.S.C. § 405(g).

# II.

A "disability" under the Social Security Act ("Act") is defined as "the inability to engage in 'substantial gainful activity' because of a medically determinable physical or mental impairment of at least one year's expected duration."  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007) (citing 42 U.S.C. § 423(d)(1)(A)).  A claimant's disability determination is made by an ALJ in accordance with "a five-step sequential evaluation process."  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc).  If the

claimant satisfies the first four steps of the process, the burden shifts to the Commissioner with

respect to the fifth step. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

> First, the claimant must demonstrate that [he or she] has not engaged in substantial gainful activity during the period of disability. Second, the claimant must show that [he or she] suffers from a severe medically determinable physical or mental impairment. Third, if the claimant shows that [his or her] impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, [he or she] is deemed disabled. Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform [his or her] past relevant work, in which case the claimant is not disabled. Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as [his or her] age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 399 (6th Cir. 2018) (quoting

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)).

A district court's review is limited to determining whether the ALJ's findings are

supported by substantial evidence[1] and whether the ALJ applied the proper legal standards in

reaching his or her decision. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

234, 241 (6th Cir. 2007). A reviewing court is further limited in that it is not empowered to

conduct a *de novo* review, resolve conflicts in evidence, or decide questions of credibility. *See*

*Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012). If the court finds substantial

evidence to support the Commissioner's judgment, it must affirm that decision even if it would

have decided the matter differently, and even if substantial evidence also supports the opposite

conclusion. *Id.* at 714.

---

[1]     Substantial evidence is defined as such relevant evidence as reasonable minds might accept as sufficient to support the conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

### III.

The ALJ applied the proper legal standard in reaching his opinion by conducting the five-step analysis required for evaluating social security disability cases. [Record No. 8 at 26–39]  At step one, the ALJ determines if a claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b).  Substantial gainful activity occurs when a claimant performs significant physical or mental activities for pay or profit.  20 C.F.R. §§ 404.1572(b).  The ALJ found that Ernest had not engaged in substantial gainful employment activity during the period from her alleged onset date of October 31, 2018, through her date last insured of December 31, 2023.  [Record No. 8 at 31]  He also found that Ernest last met the insured requirements of the Act on December 31, 2023.  [*Id.*]

The ALJ determines at step two whether a claimant has a medically determinable impairment that is severe or a combination of impairments that collectively are severe.  20 C.F.R. § 404.1520(c).  In this case, ALJ Stanley concluded that Ernest has the following severe impairments:  Degenerative Disc Disease of the Cervical Spine with Cervicalgia, Degenerative Disc Disease of the Lumbar Spine, Primary Osteoarthritis/Degenerative Joint Disease, Bilateral Carpal Tunnel Syndrome, Right Hand Synovitis, Bilateral Hip Trochanteric Bursitis, Neuropathic Pain involving the Right Lateral Femoral Cutaneous Nerve/Neuralgia Paresthetica of Right Leg, Positive Antinuclear Antibody, Obesity, Adjustment Disorder, and Unspecified Anxiety Disorder/Generalized Anxiety Disorder.  [Record No. 8 at 32]

Step three requires the ALJ to ascertain if the claimant has an impairment or combination of impairments that are of severity sufficient to meet or equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  At this step, the ALJ found that, through the date last insured,

Ernest's medical impairments did not meet or medically equal the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Record No. 8 at 32]

The ALJ considers at step four whether a claimant has a RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(f). Here, after careful consideration of the entire record, ALJ Stanley found that Ernest has the RFC to perform

> light work as defined in 20 CFR 404.1567(b) except she can occasionally push and pull using the upper extremities; can occasionally push and pull using the lower extremities; can occasionally climb stairs and ramps, but cannot climb ropes, ladders and scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; can occasionally reach overhead; can frequently handle; can occasionally operate foot pedals; must avoid concentrated exposure to vibration; cannot work at unprotected heights or around hazards such as heavy equipment; can understand, remember and carry out simple instructions and use judgement to make simple work-related decisions; can maintain adequate attention and concentration to perform simple tasks on a sustained basis with normal supervision; can manage and tolerate occasional changes in a routine work setting; can adapt to the pressures of simple routine work; and can interact occasionally with supervisors, coworkers and the public.

[Record No. 8 at 34] He also determined that Ernest was unable to perform any past relevant work through the date last insured. [*Id.* at 37]

At step five, the ALJ determines whether the claimant can do any other work considering his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). ALJ Stanley determined that, "[t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." [Record No. 8 at 38] This included occupations such as office helper, mail clerk, and garment sorter. [*Id.*] As a result, the ALJ found that Ernest was not "disabled" within the meaning of the Act, at any time from October 31, 2018, the alleged onset date, through December 31, 2023, the date of last insured. [*Id.* at 39]

-5-

**Limitations Regarding Supervision**

Ernest argues that the ALJ's RFC finding is internally inconsistent. More specifically, she contends that the ALJ found she could maintain adequate attention and concentration to perform simple tasks on a sustained basis with "normal supervision," while also limiting her to only "occasional" interactions with supervisors. [Record No. 11 at 7 (citing Record No. 8 at 34)] According to Ernest, the limitation to "normal supervision" conflicts with the restriction to "occasional" interactions with a supervisor. [*Id.*] She asserts that "normal supervision" means unrestricted supervision that may occur continuously throughout the entire workday, although she cites no authority for that definition. [*Id.*] She further states that "occasional interaction" with supervisors means very little up to one-third of the workday. [*Id.* (citing Social Security Ruling 96-9p)] Based on this purported conflict, Ernest argues that this alleged error is not harmless because the vocational expert did not explain whether the identified jobs require normal supervision or whether they can be performed with only occasional supervisory interaction. [*Id.*] She therefore maintains that the ALJ's decision is not supported by substantial evidence. [*Id.* at 8]

But according to the Commissioner, the RFC finding is not internally inconsistent and Ernest has not shown any error. [Record No. 15 at 3–4] He notes that Ernest provides no support for her interpretation of "normal." [*Id.*] Citing Merriam-Webster, the Commissioner defines "normal" as "conforming to a type, standard, or regular patterns: characterized by that which is considered usual, typical, or routine." [*Id.* (citing *Normal*, *Merriam-Webster*, www.merriam-webster.com/dictionary/normal (last visited Feb. 23, 2026))] He argues that Ernest offers no evidence that the usual, typical, or routine workplace supervision is constant or requires more than occasional interaction with a supervisor. [*Id.* at 4] The Commissioner

points out that the ALJ presented a hypothetical individual with Ernest's RFC and vocational factors to the vocational experts, who identified three jobs the individual could perform.  [*Id.*] Nothing in the testimony, according to the Commissioner, suggests that the vocational expert found the term "normal supervision" confusing or inconsistent with a limitation to occasional interaction with supervisors.  [*Id.* (citing Record No. 8 at 38, 63–68)]

Ernest contends in her reply that the Commissioner misses the point.  She argues that any restriction on an employee's ability to interact with a supervisor necessarily affects what constitutes normal supervision.  [Record No. 17 at 2]

Ernest has not shown that "normal supervision" conflicts with "occasional" interactions with a supervisor.  To begin, Social Security regulations indicate that "occasionally" refers to quantity.  Under SSR 96-9p, the term generally means occurring from very little up to one-third of the workday—typically no more than two hours in an eight-hour.  In that context, "occasionally" plainly addresses the duration or frequency of interactions.  Ernest urges the Court to define "normal supervision" in terms of duration and frequency, as unrestricted supervision that could occur continuously throughout the workday.  [Record No. 11 at 7]  She further argues that any limitation on interaction with a supervisor necessarily alters what constitutes "normal" supervision.  [Record No. 17 at 2]  However, she cites no supporting authority, and the Court is not persuaded.  She offers no convincing argument that "normal supervision" is incompatible with "occasional" interactions.

The administrative record further undermines her position.  During the administrative hearing, ALJ Stanley posed a hypothetical that included an individual who could "maintain adequate attention and concentration to perform simple tasks on a sustained basis with normal supervision" and could "interact occasionally with supervisors."  [Record No. 8 at 64]  In

response, the vocational expert testified that such an individual could perform other work. [*Id.* at 65] Thus, the vocational expert considered both limitations in concluding that an individual with that RFC could work. The ALJ relied on this testimony in finding that jobs existed in significant numbers in the national economy that Ernest could perform. [*Id.* at 38]

In summary, Ernest has not demonstrated any conflict between the ALJ's limitation to "occasional" interaction with supervisors and the reference to "normal" supervision. Neither the vocational expert nor the ALJ was required to provide additional explanation.

**Vocational Expert's Testimony Regarding Push/Pull Limitations**

Ernest also argues that the ALJ's step-five finding is not supported by substantial evidence because the vocational expert failed to account for a limitation to occasional pushing and pulling with the upper extremities. [Record No. 11 at 9] She contends that when the ALJ posed a hypothetical restricting an individual to occasional pushing, pulling, and overhead reaching with the upper extremities, the vocational expert addressed only the overhead reaching limitation. [*Id.* (citing Record No. 8 at 65–66)] According to Ernest, the expert did not clarify whether reducing pushing and pulling from frequent to occasional would eliminate the previously identified jobs. [*Id.*] She asserts that the omission is significant because the RFC ultimately limited her to occasional pushing and pulling with the upper extremities. [*Id.* at 10] In her view, the vocational expert never confirmed that the identified jobs remained available under that restriction. [*Id.*]

Based on this premise, Ernest maintains that the RFC materially differs from the limitations meaningfully addressed in the hypothetical question. [*Id.* at 10] She therefore argues that the step-five finding is unsupported by substantial evidence because the record

lacks testimony establishing that jobs exist for an individual limited to occasional pushing and pulling with the upper extremities. [*Id.* at 10–11]

Again, the Commissioner disagrees with Ernest. He asserts that the vocational expert considered all the limitations the ALJ identified—including occasional pushing and pulling—and identified jobs consistent with those restrictions. [Record No. 15 at 6] He further argues that the ALJ presented a complete hypothetical incorporating every limitation the ALJ found supported by the record. [*Id.*] In response to that hypothetical, the vocational expert identified three jobs that an individual with Ernest's RFC and other vocational factors could perform. [*Id.*]

The central question is whether the vocational expert considered a limitation to occasional pushing and pulling when concluding that jobs existed in significant numbers in the national economy for someone with Ernest's RFC. The ALJ posed several hypotheticals reflecting varying RFC assessments during the administrative hearing. [Record No. 8 at 64–68] The first hypothetical limited the individual to *frequent* pushing and pulling with the upper extremities and overheard reaching. [*Id.* at 64] The ALJ then modified those limitations in the second hypothetical:

> Q. For hypothetical #2, I'd like you to assume the individual has the same capabilities and limitations as in the previous hypothetical, except she can occasionally push, pull and reach overhead using the upper extremities. With those additional limitations, could the individual perform any work?
>
> A. The jobs I identified do not require any more than occasional reach overhead. So there'd be no impact on them and they're still available.

[*Id.* at 65–66] Thus, the jobs identified under the first hypothetical remained available under the second, which expressly reduced pushing, pulling, and overhead reaching to occasional.

Although the vocational expert specifically mentioned overhead reaching in her response, the hypothetical itself incorporated all three limitations. The expert's failure to single out pushing and pulling does not establish that she ignored those restrictions.

The ALJ then posed a third hypothetical that added environmental limitations. [*Id.* at 66] The vocational expert testified that the additional restrictions did not affect the previously identified jobs but did not address each added limitation individually. [*Id.*] This exchange further demonstrates that the expert evaluated the combined limitations presented and identified jobs consistent with them.

An ALJ may rely on vocational expert testimony concerning the availability of suitable work as substantial evidence when the hypothetical question accurately reflects the claimant's credible limitations. *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) (citing *Varley v. Sec. of Health & Hum. Servs.*, 820 f.2d 777, 779 (6th Cir. 1987)). Here, the ALJ incorporated all limitations he found credible into the hypotheticals. Ernest does not challenge the accuracy of those limitations as presented. [*See* Record Nos. 11 and 17.] In response, the vocational expert identified three jobs—office helper, mail clerk, and garment sorter—that an individual with Ernest's RFC could perform. [Record No. 8 at 65] And Ernest does not argue that these jobs require more than occasional pushing and pulling. [*See* Record Nos. 11 and 17.]

Additionally, the ALJ inquired of the vocational expert whether her testimony is consistent with the Dictionary of Occupation Titles, and the expert confirmed that it was. [Record No. 8 at 68]; *see Centers v. Colvin,* No. CIV.A. 5:14-194-KKC, 2015 WL 3637402, at *4 (E.D. Ky. June 10, 2015) (citing SSR 00–4P, 2000 WL 1898704, at *4 (Dec. 4, 2000)). Therefore, the ALJ was entitled to rely on the vocational expert's testimony, which constitutes

-10-

substantial evidence in support of his decision. *See id.* (citing *Martin v. Comm'r of Soc. Sec.,* 170 F. App'x 369, 374 (6th Cir.2006)

Because the record does not demonstrate that the vocational expert failed to account for the limitation to occasional pushing and pulling with the upper extremities, and because the ALJ relied on substantial evidence at step five, the Court may not reweigh the evidence or substitute its judgment *even if* substantial evidence could also support a different conclusion. *See Ulman*, 693 F.3d at 714.

### Evaluation of Ernest's Subjective Testimony

Ernest also contends that the ALJ failed to provide any meaningful analysis of her testimony and subjective statements. [Record No. 11 at 12] She asserts that, although she offered extensive testimony about her daily activities and explained how her impairment limited those activities, the ALJ never evaluated her activities of daily living or the other non-medical evidence in the record, as required by Social Security Ruling 16-3p. [*Id.* at 13]

Ernest argues that the ALJ's failure to evaluate the non-medical evidence constitutes legal error and renders the decision unsupported by substantial evidence when the record is considered as a whole, because a significant portion of the evidence was not addressed. [*Id.*] Specifically, she maintains that the ALJ discounted her complaints of pain based solely on objective medical findings, in violation of Social Security Ruling 16-3p. [*Id.*] She further contends that the ALJ's "conclusory rejection" of her testimony—without identifying or explaining any inconsistencies—was insufficient. [*Id.*]

The Commissioner argues in response that the ALJ did not rely solely on a lack of supporting objective evidence when evaluating Ernest's subjective statements. [Record No. 15 at 6] He maintains that the ALJ discussed the evidence of record and that this discussion

explains why the AJ did not fully credit Ernest's statements, thereby providing sufficient explanation for this Court to trace his reasoning. [*Id.* at 7]  Specifically, the Commissioner asserts that the ALJ emphasized that the objective evidence did not support Ernest's allegations regarding physical or mental impairments, evaluated her course of treatment and response to that treatment, and considered her daily activities. [*Id.* at 7–10]

An ALJ applies a two-step analysis when evaluating a claimant's subjective complaints of pain or other symptoms.  First, the ALJ determines whether an "underlying medically determinable physical or mental impairment … could reasonably be expected to produce an individual's symptoms, such as pain." Soc. Sec. Ruling 16-3p, 2016 WL 1119029, at *3 (Mar. 28, 2016).  Second, the ALJ evaluates the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*  Here, ALJ Stanley properly applied this framework.

Here, the ALJ found that Ernest's medically determinable impairments could reasonably be expected to cause her alleged symptoms. [Record No. 8 at 35]  However, the ALJ reasonably determined that Ernest's statements concerning intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. [*Id.*]; 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled.  There must be objective medical evidence from an acceptable medical source that . . . would lead to a conclusion that you are disabled.")

The ALJ expressly considered Ernest's testimony in his opinion.  He acknowledged her reports of significant neck pain, difficulty lifting, reaching, rotating her head, or looking down; and her claim that she could look down for only five minutes before pain limited activities

-12-

such as writing and washing dishes.  [Record No. 8 at 35]  ALJ Stanley noted her statement that pain required thirty to sixty minutes of rest to subside, was moderate to severe, and radiated from her shoulder to her hand, making it hard to grasp objects.  [*Id.*]  He also recognized Ernest's complaints of back and bilateral hip pain, depression and anxiety related to pain, and estimates that she could stand or walk for five to ten minutes and sit for thirty minutes.  [*Id.*] And he acknowledged her claims that she could perform light activities for only a few minutes, had experienced worsening fatigue over ten years, obtained the most relief when sitting or lying down, and used medications including naproxen, Tylenol, Celebrex, Xanax, and amitriptyline.  [*Id.*]

The ALJ likewise addressed her reported daily limitations earlier in his decision.  He noted her statements that pain and fatigue made it difficult to count change or balance a checkbook; that she rarely left the home except for medical appointments; that she had difficulty concentrating, paying attention, and with short-term memory; that she used a medication planner; that she needed to reread written instructions and could follow only simple spoken instructions; and that she struggled with showering, dressing, completing simple task, and experiences anxiety while performing them.  [*Id.* at 33]

The ALJ reviewed the record and explained why he did not fully credit Ernest's subjective statements.  [Record No. 8 at 35–37]  He emphasized that the objective evidence did not support her allegations regarding her physical impairments.  [*Id.*]  Although he acknowledged degenerative changes and stenosis in her neck that sometimes caused pain and reduced range of motion, he noted that many examination findings were otherwise normal. [*Id.* at 35–36 (citing Record No. 8 at 841)]  For example, Ernest exhibited normal gait, normal muscle strength, and normal coordination and reflexes.  [*Id.* (citing Record No. 8 at 899–901,

-13-

1838–1840)]  The ALJ also noted that imaging of Ernest's back and sacroiliac joints revealed only mild degenerative changes.  [*Id.* at 31 (citing Record No. 8 at 352, 837)]  While the ALJ recognized that the objective evidence supported some functional limitations, he concluded that it did not substantiate restrictions so severe that Ernest could not perform regular work activity on a sustained basis.  [*Id.*at 37]

The ALJ likewise found that the objective evidence did not support Ernest's claim of disabling mental impairments, including her assertion that she could pay attention for only a few minutes and required frequent repetition.  [Record No. 8 at 36] He also considered Ernest's course of treatment and her response to that treatment.  [*Id.*]  The ALJ noted that, during a June 2022 consultative psychological examination, Ernest denied any prior hospitalization for her mental health.  [*Id.* (citing Record No. 8 at 674–78)] She maintained normal eye contact, displayed responsive facial expressions, and demonstrated cooperative attitude, appropriate affect, and dysthymic mood.  [*Id.* (citing Record No. 8 at 674–78)] Although she reported difficulty focusing and remembering, the examiner observed that her attention and concentration were normal.  [*Id.* (citing Record No. 8 at 674–78)]

The ALJ further noted that the examiner diagnosed anxiety disorder and adjustment disorder with depressed mood.  [*Id.* (citing Record No. 8 at 674–78)]  He also observed that Ernest consistently received medication for anxiety and depression and that her symptoms appeared reasonably controlled.  [*Id.* (citing (Record No. 8 at 427, 494, 503, 671; *see generally* Record No. 8 at 491–673, 682–84, 701, 708, 762; *see generally* Record No. 8 at 689–883, 884–918, 944; *see generally* Record No. 8 at 930–1190, 1839.)]  Finally, the ALJ noted that mental health therapy notes from 2019 through 2021 reflected situational increases in anxiety

-14-

but generally documented normal mental status examinations. [*Id.* (citing Record No. 8 at 393–490)]

Nonetheless, Ernest argues that the ALJ failed to consider her daily activities when evaluating her statements about pain and limitations. But the opinion shows otherwise. As discussed above, the ALJ addressed Ernest's complaint of restricted functioning and evaluated evidence of her daily activities. For example, the ALJ noted that Ernest could interact with others to obtain goods and services and could coordinate her medical care with healthcare providers. [Record No. 8 at 33 (citing Record No. 8 at 267)] The ALJ also emphasized that Ernest completed daily tasks in a reasonable manner and independently performed necessary activities of daily living. [*Id.*] She lives with her disabled husband, maintains a driver's license, and drives to the grocery store and bank. [*Id*; *see* Record No. 8 at 48.]

Ernest finds no relief from the claim that the ALJ improperly considered the evidence presented by not addressing every individual piece in explaining his decision. In fact, an ALJ can reasonably and properly consider a body of evidence, which often includes a claimant's statements, without listing each component part and the weight assigned to it. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

In this case, the ALJ did not commit reversable error, by failing to spend significant time discussing whether he found Ernest's personal statements credible or analyzing her daily activities in depth. Instead, he provided an adequate discussion that enables meaningful review and demonstrates that his determination was supported by substantial evidence. The Court is

-15-

not at liberty to "second-guess" this decision "as long as the ALJ cited substantial, legitimate evidence to support his factual conclusions," as he did here. *Ulman*, 693 F.3d at 714.

### Medical-Vocational Grid Rules in a Borderline-Age Situation

Finally, Ernest argues that the ALJ failed to acknowledge the existence of a borderline-age situation and did not apply the required "sliding scale" analysis to determine the appropriate age category. [Record No. 11 at 16 (citing 20 C.F.R. §§ 404.1563(b), 416.963(b))] She was 54 years, 7 months, 10 days old when the ALJ issued the decision—less than five months from reaching the "advanced age" category. [*Id.*] She contends that the ALJ would have found her disabled, had he properly applied the borderline-age rule. [*Id.*]

The Commissioner asserts that the ALJ expressly acknowledged the potential borderline-age issue, but found no basis to apply the medical-vocational rules non-mechanically. [Record No. 15 at 11 (citing Record No. 8 at 39)[2] He further argues that Ernest failed to show the required additional vocational adversities, and the record contains none. [*Id.* at 11–12] The Commissioner therefore maintains that the ALJ reasonably declined to apply the higher age category. [*Id.* at 12]

Subsection (b) of the governing regulation provides that there is to be some flexibility between the age categories in "borderline" situations:

> How we apply the age categories. When we make a finding about your ability to do other work under § 404.152 0(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are

---

[2]    The Commissioner also contends that a borderline age situation does not even appear to exist because under Title II, Ernest had to demonstrate that she was disabled prior to her date of last insured of December 23, 2023. [Record No. 15 at 11, n. 2 (citing *see* 20 C.F.R. §§ 404.130, 404.131; *Gibson v. Sec'y of Health, Educ. & Welfare*, 678 F.2d 653, 654 (6th Cir. 1982))] As of December 23, 2023, the Commissioner explains that Ernest was more than six months away from turning 55 and moving into the age category of advanced age. [*Id.*]

-16-

disabled.  We will not apply the age categories mechanically in a borderline situation.  *If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.*

20 C.F.R. § 404.1563(b) (emphasis added).

Ernest was born on June 27, 1969.  [Record No. 8 at 37]  She was 49 years old, classified as a "younger individual" (ages 18-49), on the alleged onset date.  [*Id.*]  Before the date last insured, she moved into the "closely approaching advanced age" category.  [*Id.* (citing 20 CFR § 404.1563)]  The ALJ noted that Ernest's was 54 years and 7 months old at the time of the decision and within five months of her fifty-fifth birthday, when the medical-vocational rules would direct a finding of disabled.  [Record No. 8 at 38–39]  Even so, he found no compelling reason to apply the rule non-mechanically.  [*Id.* at 39]

Although there may not have been a borderline situation during the relevant period, the ALJ nonetheless addressed the issue.  [*Id.* at 39]  Ernest argues that the ALJ failed to include the required borderline-age analysis in his decision.  However, the ALJ was not required to do so and reasonably classified Ernest as "closely approaching advanced age" rather than "advanced age," despite any potential borderline-age status.

The Social Security Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) instruct ALJs to use a "sliding scale" approach in borderline cases.  *Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510, 516 (6th Cir. 2011).  Under this approach, "the claimant must show progressively more additional vocational adversity(ies)—to support use of the higher age—as the time period between the claimant's actual age and his or her attainment of the next higher age category lengthens."  *Id.* at 516–17.  Examples of "additional vocational

-17-

adversities" include limited literacy in English, the marginal ability to communicate in English, and having work experience in unskilled jobs in one isolated industry or work setting. *Id.*

However, the United States Court of Appeals for the Sixth Circuit has held that the regulations "do[ ] not impose on ALJs a *per se* procedural requirement to address borderline age categorization in every borderline case." *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008), as amended (Nov. 11, 2008). Although ALJs must not apply the age categories mechanically and must "consider whether use of an older age category would be appropriate in a borderline case, nothing in this language obligates an ALJ to address a claimant's borderline age situation in his opinion or explain his thought process in arriving at a particular age-category determination." *Id.* "Rather," according to *Bowie*, "the regulation merely promises claimants that the Administration will 'consider' veering from the chronological-age default in borderline situations." *Id.* Absent a showing of additional vocational adversities, the ALJ may use the claimant's chronological age—even if the claimant is only days from the next category—and need not explain that choice. *Id.* at 399–400. The court upheld the ALJ's decision in *Bowie* because the claimant showed no additional adversities and substantial evidence supported the disability determination. *Id.* at 401.

Ernest does not argue that she had additional vocational adversities, and the record shows none. [*See* Record Nos. 11 and 17.] She is not barely literate and does not have a limited education; she holds a bachelor's degree and a nursing license. [Record No. 8 at 37–38, 229, 231–32] Her past work as a nurse was not an unskilled job and not limited to an isolated industry. [*Id.* at 37, 232] The record also reveals no other adverse circumstances that would justify applying the higher age category. Accordingly, the ALJ reasonably declined to apply the advanced-age category and was not required to explain that decision further.

-18-

**IV.**

Based on the foregoing analysis and discussion, it is hereby **ORDERED** as follows:

1.    Plaintiff Elizabeth Ernest's motion for judgment [Record No. 11] is **DENIED**.

2.    Defendant Commissioner of Social Security's motion for judgment [Record No. 15] is **GRANTED.**

3.    This action is **DISMISSED** and **STRICKEN** from the docket.

Dated:  February 26, 2026.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky